**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| SOCORRO BERENGUER, | ) | No. CV 05-04134-SS |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM DECISION AND ORDER** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

Plaintiff Socorro Berenguer brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying her application for Supplemental Security Income ("SSI"). Alternatively, she asks for a remand. On October 12, 2005, the parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. This matter is before the Court on the parties' Joint Stipulation ("JS") filed on February 10, 2006. For the reasons stated below, the decision of the Commissioner is REVERSED AND REMANDED.

\\

\\

**PROCEDURAL HISTORY**

On January 6, 2003, Plaintiff protectively filed an application for SSI benefits.  (Administrative Record ("AR") 83-95).  She claimed that she became unable to work on August 15, 2001 due to arthritis, diabetes, high blood pressure, dizziness, chronic allergies, a broken knee cap, abnormal heart beats and tumors on her head.  (AR 108).

The Agency denied Plaintiff's application on June 26, 2003.[1]  (AR 64-67).  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 68-69).  A hearing before ALJ Joel B. Martinez was conducted on September 2, 2004.[2]  (AR 352-76).  Plaintiff, who was represented by counsel, testified on her own behalf.  (AR 355-69).  A vocational expert ("VE") also testified.  (AR 369-70).  On October 14, 2004, the ALJ issued a decision denying benefits.  (AR 44-55).  On April 15, 2005, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (AR 5-7).  Plaintiff subsequently filed her Complaint on June 10, 2005.

\\

\\

\\

\\

---

[1]     This being a prototype case, the next level of review was before an Administrative Law Judge.  (AR 47, 65).

[2]     The hearing was originally set for April 19, 2004, but Plaintiff did not attend the hearing because she was being held in a psychiatric facility during this time.  (AR 82, 244).

2

**FACTUAL BACKGROUND**

**A.   Plaintiff's Testimony and Daily Activities Questionnaire**

Plaintiff testified at the hearing with the help of a translator. She was born on June 28, 1945, and was fifty-nine years old at the time of the hearing.  (AR 355-56).  She stated that she moved from Cuba when she was thirty years old and spoke only a "little bit" of English.  She finished twelve years of education in Cuba.  (AR 356).  She was divorced, had five children, and lived by herself in a studio apartment in Glendale.  (AR 357-58).  Although she had a valid driver's license, she claimed that she drove only "a little," not "long way," and that one of her daughters drove her when she needed to go to the hospital or anywhere else.  Plaintiff testified that she now supported herself through welfare.  She received about $221 and $140 in food stamps a month.  (AR 359; see also AR 90).

Plaintiff worked for twenty years as a housekeeper for Prudential Insurance Company, cleaning offices.  (AR 360).  She also worked full-time taking caring of elderly people in their homes and also took care of her granddaughter. (AR 362-64).  She has not worked since 2001.  (AR 364).

Plaintiff testified to having numerous ailments, including bunions, shortness of breath, hearing voices, crying, sleep problems, and "very bad" nerves.  (AR 365).  She also stated that she had "a lot of pain" in

her shoulders.[3]   (AR 365, 368).   When asked what was her worst problem, she answered, "I hear voices."   (AR 364-67).   She stated that she was receiving mental health treatment for this problem and was prescribed Prozac and Risperdal.   (AR 365-66).   She asserted that, after learning of her daughter's death, she heard voices "telling [her] to kill [herself]."   (AR 367).   In addition, Plaintiff claimed that she was "afraid to look [at herself] in the mirror" because she would have visual hallucinations of her "face with wrinkles."   (AR 366-67).

Plaintiff stated that, on April 12, 2004, she was admitted into a psychiatric facility (Olive View) for twelve days because she was "hearing voices" and had suicidal impulses.   (AR 244, 366, 369). Plaintiff testified that the prescriptions helped her and she did not want to kill herself anymore.   (AR 366, 367).   However, she stated that she did not have the financial resources to continue receiving the medications.[4]   (AR 367-69).

Plaintiff testified that even after she started hearing voices, she continued to live alone.   However, she stated that her daughter lived in the house in front of her.   (AR 368).   When asked whether she did her own cooking, Plaintiff stated that she drank soup that she "already made," or ate sandwiches.   Sometimes, her neighbor gave her some food.

---

[3]   Plaintiff asserted to having additional impairments, including the inability to "walk very much" and "shortness of breath."   (AR 365). However, Plaintiff has not raised any issues pertaining to these impairments, and therefore the Court will not address them.

[4]   Plaintiff stated that her doctor at the Verdugo Mental Health Center required Medi-Cal or another form of payment in order to continue prescribing the medications.   (AR 367-69).

4

(AR 368).   In her Daily Activities Questionnaire, Plaintiff confirmed that she prepared and cooked her own meals, including "soup, vegetables, and sandwiches." (AR 129).   She also went grocery shopping one or two times a week and was able to do the laundry and cleaning without assistance.   Plaintiff indicated that she went out of her home about two or three times a week, either driving herself or catching a ride.   She went to the market, to the doctor's offices, to the hospital, and to the welfare office.   (AR 130).   Plaintiff spent the day watching TV for about three hours and reading for about an hour each day.   (AR 130, 131).   She remembered the programs she watched and the books she read. (AR 130).

Plaintiff also indicated that she did not have difficulties getting along with family, friends, neighbors, co-workers or others.   (AR 131). She visited with family or friends on a daily basis.   (AR 131).   She did not have any difficulties in following written or verbal instructions. (AR 131).   However, she claimed that she sometimes had trouble sleeping and concentrating.   (AR 129, 131).

**B.**   <u>**Treating Physicians' Evaluations**</u>

1.   Verdugo Mental Health Center

Dr. Richard Ciasca, a psychiatrist, was Plaintiff's treating physician at the Verdugo Mental Health Center from May 17, 2004 to

January 18, 2005.[5]  (AR 276-285).  Dr. Ciasca diagnosed Plaintiff with major depressive disorder with psychotic features.  (AR 276-81, 284). In addition, Dr. Ciasca conducted a mental status examination ("MSE") on May 17, 2004 and determined the following:

> MSE: O[riented] times three.  Mood depressed.  Gi[v]es good contact.   Normal  flow  and  content  of  thought.   Denies [suicidal] ideation.  Not tangential or circumstantial.  Not racing or pressured.  Memory intact.

(AR 276).

Throughout the course of treatment, Dr. Ciasca noted Plaintiff's complaints of depression.  (AR 276-81, 284).  Plaintiff stated that she became depressed after hearing of her daughter's death on August 2003.[6] (AR 276-77).  Dr. Ciasca also recorded Plaintiff's statements concerning her visual and auditory hallucinations.  (AR 276-81, 284).  Plaintiff asserted  that  she  heard  her  deceased  daughter's  voice  "asking [Plaintiff] to join [the daughter]."  (AR 277).  Plaintiff also stated

_____

[5]    Plaintiff first began receiving treatment from the Verdugo Mental Health Center on April 28, 2004.  (AR 270-85).  On that day, Dr. Hsing-Fang Chang conducted an intake assessment and diagnosed Plaintiff's with major depressive disorder with psychotic features.  (AR 270-75).  Dr. Chang also concluded that Plaintiff's GAF was 30.  (AR 275).

[6]    Plaintiff has experienced other episodes of depression.  For example, Plaintiff stated that her divorce in 1982 led to depression and auditory hallucinations.  (AR 276).  Additionally, Plaintiff stated that she felt depressed and had psychotic symptoms on the first week of April 2004, after her daughter "want[ed] to kick [her] out" of the apartment. (AR 277).  Plaintiff lives alone in the back unit of her daughter's property.  (AR 94, 273).

that she was having visual hallucinations of wrinkles on her face and of appearing very old.  (AR 279).

Plaintiff reported that medications helped her sleep better and helped control her depression and psychotic symptoms.  (AR 276, 279). On October 6, 2004, Dr. Ciasca recorded that Plaintiff was not currently hearing voices.  (AR 281).   Throughout the course of treatment, Plaintiff denied having suicidal ideations.  (AR 276-80).   In addition, Dr. Ciasca noted that Plaintiff missed two consecutive appointments. (AR 282-83).

On January 18, 2005, Dr. Ciasca completed a mental impairment questionnaire.  (AR 260-68). He concluded that, "due to [the] nature of [her] illness and disabil[i]ty, [Plaintiff] would have problems maintaining work."  (AR 263).   Specifically, Plaintiff would have moderate restrictions in her daily living activities; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of deterioration in work settings.[7]  (AR 263).  Dr. Ciasca determined that Plaintiff's Global Assessment of Functioning ("GAF") score at that time was 45.[8]  (AR 260).   The clinical findings were based on Plaintiff's

---

[7]      "Marked" means more than moderate but less than extreme.  (AR 263).  "Repeated" means three or more.  (AR 263).

[8]      A GAF score is the clinician's judgment of the individual's overall level of functioning.   It is rated with respect only to psychological, social and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (hereinafter "DSM IV").

history of depression with psychotic symptoms and her complaints of experiencing auditory hallucinations, dysphoria and depression.[9] (AR 261). Dr. Ciasca noted that the medications had slightly improved Plaintiff's mental health, but that she still had symptoms of illness.[10] (AR 261).

2.    Broadway Family Medical Center

Plaintiff received treatment from the Broadway Family Medical Center from October 23, 2002 to January 21, 2005. (AR 307-45). The record contains treatment notes from Drs. Leonardo Garduno and Vardui Arutyunyan. On January 2, 2005, Dr. Garduno noted that Plaintiff was having problems with her family and that she was tearful. (AR 308). However, Plaintiff denied having suicidal ideation. (AR 308).

Throughout the course of treatment, Drs. Garduno and Arutyunyan diagnosed Plaintiff with numerous physical ailments, including non-insulin dependent diabetes mellitus, hypertension and left "frozen

---

A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 34.

[9]    Dr. Ciasca noted that Plaintiff had the following symptoms: poor memory, sleep disturbance, mood disturbance, delusions or hallucinations, perceptual disturbances, social withdrawal or isolation, decreased energy, anhedonia or pervasive loss of interests and feelings of guilt/worthlessness. (AR 260-61). However, contrary to his finding of "poor memory," Dr. Ciasca concluded, after conducting the MSE, that Plaintiff's memory was "intact." (AR 276).

[10]    Plaintiff was being treated with Risperdal 1mg and Prozac 10mg. (AR 261, 263).

shoulder." (AR 308, 312, 316, 318, 321, 323, 325, 327, 329, 336, 338, 341). In particular, on June 3, 2003, Dr. Garduno noted that the range of motion of Plaintiff's left shoulder was limited to 90° in all directions. (AR 327).

### 3.   Olive View – UCLA Medical Center

Plaintiff received medical care from Olive View from October 25, 2002 to April 12, 2004. (AR 167-80, 237-39, 243-44). On January 30, 2003, Dr. Katherine Yu noted a multitude of medical problems, including uncontrolled diabetes, left leg pain and left shoulder pain. A physical exam showed limited range of motion in Plaintiff's left shoulder. Dr. Yu referred Plaintiff to physical therapy for the shoulder pain. Dr. Yu also noted depression after Plaintiff reported feeling "abandoned" by her children. (AR 167). Similar to the doctors at the Broadway Family Medical Center, the doctors at this facility also diagnosed Plaintiff with diabetes mellitus and hypertension." (AR 167, 169, 170, 176-80). In addition, on April 12, 2004, Plaintiff was involuntarily admitted into Olive View because she stated that she was going to kill herself. (AR 295).

### C.   **Consultative Evaluations**

Plaintiff underwent multiple consultative examinations. On April 12, 2003, Dr. Alexandre Mihelson conducted an internal medicine evaluation. (AR 181-186). He determined that the range of motion of Plaintiff's left shoulder was "50% of the predicted." (AR 184). Dr. Mihelson opined that Plaintiff could push, pull, lift and carry about

fifty pounds occasionally and about twenty-five pounds frequently; could stand and walk for six hours and sit unlimitedly in an eight-hour workday; had postural restrictions including bending, kneeling, stooping, crouching and crawling; had no environmental restrictions; and had no restrictions in the use of her hands for fine and gross manipulations. (AR 185).

On June 5, 2003, Dr. Albert Shnaider conducted a psychiatric evaluation and determined that Plaintiff had an adjustment disorder with depression and anxiety, due to family difficulties.[11] (AR 192). Dr. Shnaider reasoned that Plaintiff's symptoms were consistent with his diagnosis because Plaintiff's physical complaints did not appear to significantly influence her psychological conditions. (AR 192). Specifically, Plaintiff stated that she had been depressed and anxious since September 2002 due to conflicts with her daughter and financial difficulties. (AR 188). Plaintiff thought that if she were able to move out of her daughter's apartment, her psychiatric problems would resolve. (AR 188-89). Despite her complaints, she had never been treated by a mental health physician and was able to maintain an independent lifestyle, i.e., could take care of her activities of daily living independently unless limited by pain. (AR 192).

The MSE did not reveal any evidence of deficiencies in Plaintiff's attitude and behavior, intellectual functioning and sensorium, concentration, abstract thinking, judgment or reality contact (i.e.,

---

[11] Due to Plaintiff's inability to proficiently communicate in English, an interpreter was used. (AR 188).

Plaintiff did not have auditory or visual hallucinations).[12]   (AR 191-92).   However, Plaintiff's mood was described as depressed but Plaintiff did not have suicidal ideation.   (AR 191).   Dr. Shnaider assessed Plaintiff's GAF at 60 to 65.[13]   (AR 192).

Dr. Shnaider noted that, during the examination, Plaintiff became briefly tearful while she was describing her stressors, but was able to reconstitute herself quickly and effectively.   (AR 192).   Therefore, Dr. Shnaider concluded that Plaintiff might do particularly well if she worked in a fairly isolated work environment.   (AR 193).   Still, she should be able to interact with other individuals appropriately, as she has the capacity to reconstitute herself from tearfulness quickly and effectively.   (AR 193).

Dr. Schnaider concluded that Plaintiff should be able to follow simple to moderately complex oral and written directions appropriately and work without supervision.   (AR 193).   Additionally, Plaintiff should be able to adapt appropriately to routine changes in the work setting and, if properly motivated, she should be able to maintain an

---

[12]   Additionally, when asked about her history of illnesses, Plaintiff denied having psychotic symptoms.   (AR 189).

[13]   A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   See DSM IV at 34.

A GAF of 61-70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationship)."   Id.

appropriate mental pace, grooming and attendance for a simple work environment.  (AR 193).

On June 4, 2004, Dr. Edward Ritvo conducted another psychiatric evaluation and diagnosed Plaintiff with depressive reaction due to her mourning the loss of her daughter.  (AR 245-50).  Plaintiff stated that since learning of her daughter's death in the summer of 2003, she had been crying daily and hearing the deceased daughter's voice in her head. (AR 246).  Dr. Ritvo opined that Plaintiff was not having true hallucinations, but rather that this was part of her grieving process. (AR 246).

The MSE revealed that Plaintiff's thought process was coherent and organized, thought content was not psychotic, mood was friendly, pleasant and cheerful, intellectual functioning was "at least average" and insight and judgment were intact.  (AR 248-49).  Dr. Ritvo noted that Plaintiff "cried in an appropriate manner" when Plaintiff discussed her daughter's death.  (AR 249).  Dr. Ritvo assessed Plaintiff's GAF at 60.  He concluded that Plaintiff had no impairment in her ability to understand, remember or complete simple or complex commands.  (AR 250). Plaintiff should be able to interact appropriately with supervisors, co-workers or the public, and properly respond to changes in the workplace setting.  (AR 250).

### D.   __Radiologists' Evaluations__

On June 5, 2003, Dr. Marvin Weiner x-rayed Plaintiff's left shoulder and found no evidence of fracture, dislocation, or other

osseous or articular abnormality.  (AR 194).  The regional soft tissue appeared normal.  (AR 194).

### E.   Non-Examining Physician's Evaluation

On April 23, 2003, a physical residual functional capacity[14] (hereinafter "RFC") assessment was completed by Dr. Cohenzadeh, a state Disability Determination Service (hereinafter "DDS") physician.  (AR 197-204).  Dr. Cohenzadeh concluded that Plaintiff could conduct medium work.  (AR 197-204).  Specifically, Plaintiff could occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; stand or walk for about six hours; and sit for about six hours.  (AR 198). Dr. Cohenzadeh opined that Plaintiff had no limitations in her ability to reach.  (AR 200).

On June 26, 2003, Dr. Stone completed a psychiatric review technique form.  (AR 206-19).  He opined that Plaintiff had an adjustment disorder but that the impairment was not severe.  (AR 206, 209, 211, 218).  Therefore, Plaintiff was capable of performing complex work.  (AR 218).

### F.   Vocational Expert's Testimony

Ms. Elizabeth Brown testified at the hearing as a VE.  She asserted that Plaintiff's past relevant position as a cleaner/housekeeper

_____

[14]   RFC is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

required light exertion and was considered to be unskilled.  (AR 370).
Plaintiff's past position as a caregiver required medium exertion and
was considered to be semiskilled.  (AR 370).  The ALJ posed a
hypothetical to Ms. Brown involving an individual of the same age,
education and vocational background as Plaintiff, with the RFC to
perform medium work.[15]  (AR 370).  The ALJ's hypothetical indicated that
the individual would have occasional postural limitations, and could
perform simple to moderately complex work but could not perform above-
shoulder work with the left arm.  (AR 370).  Ms. Brown opined that the
individual could not perform Plaintiff's past relevant work as a
caregiver because of the limitation in above-shoulder lifting.  (AR
370).  However, Ms. Brown concluded that the individual could perform
Plaintiff's past work as a cleaner/housekeeper.  (AR 370).

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a
medically determinable physical or mental impairment that prevents him
from engaging in substantial gainful activity[16] and that is expected to
result in death or to last for a continuous period of at least twelve
months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42
U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant
incapable of performing the work he previously performed and incapable

---

[15]   At the time of the hearing, Plaintiff was fifty-nine years
old, thereby placing her in the advanced age category.  (AR 369-70).

[16]   Substantial gainful activity means work that involves doing
significant and productive physical or mental duties, and is done for
pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

of performing any other substantial gainful employment that exists in the national economy.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

<u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F.3d at 1098-99); 20 C.F.R. §§ 404.1520(b) - 404.1520(f)(1) & 416.920(b) - 416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. <u>Bustamante</u>, 262 F.3d at 953-54 (citing <u>Tackett</u>, 180 F.3d at 1098). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. <u>Id.</u> at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F.3d at 1100-01). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process discussed above. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. (AR 48, 54). At the second step, the ALJ determined that Plaintiff had the medically determinable impairments of diabetes

16

mellitus, hypertension, small osteophytes of the thoracic spine, arthralgias and age-related osteoarthritis, a depressive disorder, a history of "left frozen shoulder" and a sacralized L5. (AR 49, 54). These impairments, in combination, were deemed to be "severe." (AR 49, 54). At the third step, the ALJ found that the impairments did not meet or medically equal any of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 49, 54).

At the fourth step, the ALJ found that Plaintiff was able to perform her past relevant work as a cleaner/housekeeper. (AR 49, 54). This determination was based on the ALJ's finding that Plaintiff retained the physical RFC to occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand and/or walk for six hours and sit for six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch and crawl. (AR 52, 54). However, the ALJ determined that Plaintiff was unable to perform above-shoulder work with her upper left extremity. (AR 52, 54). In addition, the ALJ concluded that Plaintiff retained the mental RFC to perform simple to moderately complex work.[17] (AR 52, 54).

Because Plaintiff's past work as a cleaner/housekeeper did not require the performance of work-related activities precluded by her RFC,

---

[17] The ALJ found that, based on the objective medical evidence before him, Plaintiff had no mental limitations. (AR 51). However, the ALJ gave Plaintiff "the greatest benefit of the doubt" on account of her history of depression and her mourning the loss of her daughter and accepted Dr. Schnaider's opinion that Plaintiff was limited to the performance of simple to moderately complex work. (AR 51).

the ALJ concluded that Plaintiff was not disabled at any time through the date of the decision.  (AR 54-55).

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Reddick, 157 F.3d at 720 (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

\\

18

**DISCUSSION**

**A.    Plaintiff's Shoulder Limitations Did Not Prevent Her From Performing Her Past Relevant Work As A Housekeeper**

Plaintiff argues that the ALJ erred in finding that Plaintiff could work as a cleaner/housekeeper because this work necessarily requires the use of her upper left extremity, which is inconsistent with her inability to perform such work. (JS at 5).

At step four of the sequential evaluation, claimants have the burden of showing that they can no longer perform their past relevant work. 20 C.F.R. § 404.1520(e). Although the burden of proof lies with the claimant at step four, the ALJ "still has a duty to make the requisite factual findings to support his decision." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citing Social Security Ruling (hereinafter "SSR") 82-62). The ALJ must look at the "residual functional capacity and the physical and mental demands" of the claimant's past work and make findings of fact as to the past work's requirements. 20 C.F.R. § 404.1520(e); SSR 82-62. The claimant must be able to perform the job as he actually performed it, or as it is generally performed in the national economy. Pinto, 249 F.3d at 844; SSR 82-61. In making his assessments, the ALJ may rely on the VE's testimony that contradicts the DOT if the record contains persuasive evidence to support the deviation. See Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

19

According to DOT code 323.687-014, the occupation of a cleaner/housekeeper requires the ability to "frequently" reach.[18] (AR 257). The regulations provide that DOT classifications provide a rebuttable presumption regarding certain jobs and require that the ALJ take notice of the DOT's classifications. 20 C.F.R. § 404.1566(d)(2)-(5)(e). Here, Plaintiff contends that the VE's testimony deviated from the DOT, because Plaintiff is unable to perform the act of "frequently reaching" due to the limitations of her left shoulder.[19] (JS at 5). Plaintiff concedes that the DOT is silent as to whether bilateral reaching is a required element of a cleaner/housekeeper. (JS at 13). However, she contends that the burden is on the ALJ to inquire further of the VE as to whether bilateral reaching is required. (JS at 13-14).

In his hypothetical, the ALJ asked the VE, Ms. Brown, whether an individual possessing Plaintiff's limitations (e.g., the inability to perform above-shoulder work) could work as a cleaner/housekeeper or caregiver. (AR 370). Ms. Brown testified that such an individual could perform the occupation of a cleaner/housekeeper but not that of a caregiver because of the preclusion from performing above-shoulder work. (AR 370). Based on Ms. Brown's testimony, the ALJ ruled that Plaintiff could perform her past relevant work as a cleaner/housekeeper. (AR 54).

---

[18]   "Frequently" means that the activity or condition exists from one-third to two-thirds of the time. (AR 257).

[19]   Plaintiff initially argued that "a reasonable and commonsense understanding of this occupation demonstrates that you need to be able to reach with both arms to perform this occupation satisfactorily." (JS at 5).

Here, Plaintiff is making the assumption that the occupation of a cleaner/housekeeper requires the ability to reach with both arms. (JS at 5). However, the Plaintiff incorrectly interprets the DOT's general statement that frequent reaching is required to mean that bilateral reaching is required. Not only does the DOT never expressly require such bilateral capabilities, Ms. Brown specifically testified that Plaintiff could perform as a cleaner/housekeeper without the use of her left arm. (AR 257, 370). Furthermore, Ms. Brown's assessment that Plaintiff's other past relevant work as a caregiver was not feasible reinforces that cleaner/housekeeper work, unlike caregiver work, can be accomplished despite the presence of Plaintiff's shoulder limitations. (AR 370). Accordingly, Ms. Brown took Plaintiff's limitations into careful consideration before making her decision.

Moreover, the x-rays on Plaintiff's left shoulder revealed no evidence of a fracture, a dislocation, or other osseous or articular abnormality. (AR 194). The regional soft tissue also appeared normal. (AR 194). In fact, the DDS physician, Dr. Cohenzadeh, after reviewing the x-rays and Dr. Mihelson's report, concluded that Plaintiff had no limitations in her ability to reach. (AR 196, 200). Such findings suggest that Plaintiff could perform above-shoulder work.[20] In addition, when asked by the ALJ why she stopped working, Plaintiff focused on other impairments but did not mention her shoulder problem. (See AR 365).

---

[20]   However, the ALJ rejected Dr. Cohenzadeh's findings. (AR 52). The ALJ instead opined that Plaintiff could not perform above-shoulder work based on Plaintiff's "documented history of a 'frozen left shoulder.'" (AR 52).

Plaintiff's contention that the ALJ has the burden to inquire about whether bilateral reaching was required is also meritless.  SSR 00-4p states that "[w]hen there is an <u>apparent</u> unresolved conflict between [the] VE...and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE...to support a determination ...about whether the claimant is disabled."  SSR 00-4p (emphasis added).  Here, there is no apparent conflict as neither Plaintiff nor her counsel raised this issue at the hearing.

At the hearing, the ALJ asked Ms. Brown whether an individual possessing Plaintiff's limitations, including the inability to perform "<u>above[-]shoulder...work</u> with the left upper extremity[,]" would be able to perform either of the Plaintiff's prior work.  (AR 370) (emphasis added).  Ms. Brown responded by opining that the hypothetical individual "would not be able to perform the work as . . . a caregiver, which . . . could . . . require <u>above[-]shoulder lifting</u>, but . . . the individual . . . would still be able to perform the work of [a] cleaner/housekeeper[.]"  (AR 370) (emphasis added).  The implied conflict between Ms. Brown's testimony and the DOT was not deemed sufficient to merit adversarial development, as Plaintiff raises this implied conflict only after the decision was rendered.  (AR 370-76).

Although the Ninth Circuit has never reached this specific fact pattern, one panel in the Fifth Circuit has done so.  In <u>Carey v. Apfel</u>, the claimant argued that the ALJ erred in relying on the VE's testimony that the claimant could perform certain identified jobs with only one arm, because the DOT necessarily requires the use of both arms for those jobs.  <u>Carey v. Apfel</u>, 230 F.3d 131, 145-46 (5th Cir. 2000).  The court

affirmed the ALJ's decision by reasoning that the DOT did not specify whether the use of both arms was required and the VE's testimony was clear and unchallenged.  <u>Id.</u> at 146-47.

Here, the VE's testimony that Plaintiff could work as a cleaner/housekeeper, without the ability to reach with her left arm, was similarly clear and unchallenged.  As stated above, Ms. Brown specifically testified that Plaintiff could perform her past work as a cleaner/housekeeper, given her limitations.  (AR 370).  In addition, when given an opportunity to object or cross-examine Ms. Brown, Plaintiff's counsel did not do so.  (AR 370-76).  Therefore, the ALJ properly relied on the VE's testimony.  <u>See</u> <u>Carey</u>, 230 F.3d 131, 146-47 (5th Cir. 2000).

It is not the province of the Court to re-weigh the factual and credibility determinations of the ALJ.  <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F.3d at 1097).  The Court must affirm the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal standards.  <u>Id.</u> (citing <u>Tackett</u>, 180 F.3d at 1097).  Accordingly, the ALJ did not err, based on the record as it existed before the ALJ, in finding that Plaintiff's shoulder limitations did not prevent her from performing her past relevant work.

\\

\\

\\

\\

\\

1    **B.     The Appeals Council Failed To Give Specific and Legitimate**

2            **Reasons for Rejecting Dr. Ciasca's Opinion**

3

4        The ALJ found Plaintiff to retain the mental capacity to perform

5    simple to moderately complex work.  (AR 51, 54).  Plaintiff contends

6    that the mental health treatment record submitted to the Appeals Council

7    demonstrates the existence of a more restrictive mental RFC.  (JS at 4).

8    As the record was not submitted to the ALJ, the ALJ's decision did not

9    reflect it.  Thereafter, the Appeals Council denied review of the ALJ's

10   decision after considering the additional evidence.  (AR 5).  Though

11   Plaintiff argues that the ALJ erred in determining her mental RFC, she

12   is actually challenging the Appeals Council's denial to review the ALJ's

13   decision.  (JS at 4).  Specifically, Plaintiff is challenging the

14   Appeals Council's rejection of the additional evidence.  (JS at 4).

15

16       As noted above, this evidence was not before the ALJ.  Rather, it

17   was submitted to the Appeals Council only after the ALJ's denial of

18   benefits.  This court considers, however, the materials submitted to and

19   considered by the Appeals Council in its determination of whether to

20   grant a request for review.  See Harman v. Apfel, 211 F.3d 1172, 1179-80

21   (9th Cir.), cert. denied, 531 U.S. 1038, 121 S. Ct. 628, 148 L. Ed. 2d

22   537 (2000); Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993).

23

24       The Appeals Council considered this additional report.  However, it

25   concluded that it did not provide a basis for changing the ALJ's

26   decision.  It thus denied Plaintiff request for review, making the ALJ's

27   decision the final decision of the Commissioner.

28

In disability cases, greater weight is afforded to the opinion of a treating physician than to a non-treating physician because the treating physician is hired to cure and has a better opportunity to know and observe the claimant as an individual. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). When another doctor's opinion contradicts the opinion of a treating physician, the ALJ can reject the treating physician's opinion only by setting forth "specific and legitimate" reasons for doing so, supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended). This standard applies to the Appeals Council as well. See Ramirez, 8 F.3d at 1453-54.

Here, Dr. Ciasca's opinion contradicts the opinion of the consultative examining physician, Dr. Shnaider. (See AR 188-93, 276-85). Dr. Ciasca concluded that Plaintiff had major depressive disorder with psychotic features and a GAF of 45. (AR 260-61). Furthermore, Dr. Ciasca determined that Plaintiff would have problems maintaining work.[21] (AR 263).

Conversely, Dr. Shnaider, whose opinion the ALJ adopted in his findings, diagnosed Plaintiff with depression and anxiety and assessed a GAF of 60 to 65. (AR 51, 192). He determined that Plaintiff could perform simple to moderately complex work. (AR 193).[22] The evidence of

---

[21] As noted above, Dr. Ciasca opined that Plaintiff would have marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of deterioration in work settings. (AR 263)

[22] In addition, Dr. Ritvo, a consultative examining physician, opined that Plaintiff had no mental limitations, while Dr. Stone, a

Dr. Ciasca's opinion was submitted to the Appeals Council on February 1, 2005.  (AR 259).

After receiving this new evidence, the Appeals Council denied review of the ALJ's decision by stating the following:

> In looking at your case, we considered the reasons you
> disagree with the decision and the additional evidence listed
> on the enclosed Order of Appeals Council.
>
> We found that this information does not provide a basis
> for changing the Administrative Law Judge's decision.

(AR 5-6).

Here, neither the ALJ nor the Appeals Council gave any reasons, let alone specific and legitimate reasons based on substantial evidence, for rejecting the new evidence.  Although a finding of disability is an issue reserved to the Commissioner, see 20 C.F.R. § 404.1527(e)(1), Dr. Ciasca's opinion is still an opinion that needs to be explicitly rejected with specific and legitimate reasons.  See Reddick, 157 F.3d at 725 (ALJ needs to provide specific and legitimate reasons, supported by substantial evidence, to reject treating doctor's credible opinion on ultimate issue of disability).  A remand to allow the ALJ to consider the additional report is an appropriate remedy.  Harman, 211 F.3d at 1180 (remanding to ALJ where additional records were presented only to

---

consultative nonexamining physician, determined that Plaintiff's mental impairments were not severe.  (AR 206, 250).

the Appeals Council).  As such, this case is remanded to the ALJ to give him the opportunity to consider the new evidence.

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered REVERSING the decision of the Commissioner and REMANDING this case to the Commissioner for further action consistent with this decision.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: July _5_, 2006.


_____/s/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

27